Olan Randle ROBISON,
Petitioner-Appellant,

v.

Gary MAYNARD, Warden, Oklahoma State Penitentiary, McAlester, Oklahoma; Larry Meachum, Superintendent, Department of Corrections, State of Oklahoma; and Attorney General of the State of Oklahoma, Respondents-Appellees.

No. 86–2087.

United States Court of Appeals,
Tenth Circuit.

Sept. 25, 1987.

Rehearing Denied Nov. 13, 1987.

Randy Alan Bauman, Oklahoma City, Okl., for petitioner-appellant.

Robert A. Nance, Asst. Atty. Gen., Deputy Chief, Federal Div. (Michael C. Turpen, Atty. Gen. of Okl.), Oklahoma City, Okl., for respondents-appellees.

Before MOORE, SETH, and TACHA, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

This is an appeal from an order denying federal habeas corpus to a state prisoner. Olan Randle Robison (Petitioner) sought relief from his conviction of three counts of first degree murder upon which three death sentences were imposed in Stephens County, Oklahoma.[1] Petitioner raises several issues, including denial of the right to offer evidence in mitigation of the death penalty; prosecutorial misconduct; the introduction of testimony by witnesses whose statements were taken under hypnosis; and denial of the right to effective assistance of counsel. Finding need for further development of facts on the issue of the effectiveness of Petitioner's state appellate counsel, we remand for the purpose of a limited evidentiary hearing. We affirm on the remaining issues, however.

Respondents have defended some of the issues raised on appeal on the grounds of procedural bypass. Because the issues could have been raised in the state appeal but were not, the Oklahoma courts considered the issues waived and refused to decide them in the postconviction proceedings. Accordingly, Respondents argue, the federal court is barred from entertaining them. Respondents raised the same defense in the federal district court which held to the contrary. Respondents did not appeal from this ruling; hence, the issue cannot be raised as an argument on appeal. 28 U.S.C. § 2107; Fed.R.App.P. 3. *See also Averitt v. Southland Motor Inn*, 720 F.2d 1178, 1180 (10th Cir.1983).

## I.

At dusk, on June 12, 1980, Petitioner and two accomplices drove in a car belonging to Petitioner's girlfriend, Sharon Briscoe, to the residence of Averil Bourque, Robert Swinford, and Julie Lovejoy in search of

---

1. Petitioner has received both direct and postconviction review of his sentences in the courts of the state. The record before the federal district court and that here on appeal contains the entire transcript of the trial as well as the evidence taken and the arguments heard in the state postconviction proceeding.

valuable gold jewelry they believed belonged to Ms. Bourque. Entering the house, the trio found Ms. Lovejoy, at whom Petitioner fired a single shot in the head, killing her instantly. Petitioner then went to a room occupied by Ms. Bourque and Mr. Swinford where he gained entry by smashing a locked door. Petitioner encountered Ms. Bourque and fired shots into her body and head. These wounds were not immediately fatal, because Petitioner later told a friend that one of his accomplices "finished her off" with two bullets between the eyes. Mr. Swinford, in an apparent effort to avert death, grasped Petitioner from behind in a "bear-hug," but Petitioner was able to fire a mortal shot into Mr. Swinford's side. After Mr. Swinford collapsed, Petitioner fired another shot into Mr. Swinford's prostrate body.

Petitioner and his accomplices then ransacked the house but failed to find several items of gold jewelry hidden under Ms. Bourque's body. Nonetheless, they took other items, including photographs of Ms. Bourque and Mr. Swinford.

Returning to Ms. Briscoe's car, the trio started to back onto the roadway only to find another car bearing down upon them. The driver of that car, Terry Henderson, later identified the Briscoe car and testified defendant was riding in the front passenger seat. Testimony revealed investigators attempted to enhance Ms. Henderson's recall of the encounter with the use of hypnosis.[2]

Petitioner and his friends returned to the Briscoe home from which they had set out, arriving in a state of high agitation. Petitioner instructed the group to pack for an immediate trip to Texas. Meanwhile, the photographs of the victims were displayed in the midst of laughter from the Petitioner and others. Petitioner then removed a bloodstained shirt and later had his niece clean a bloodstain from his boot.

Upon arrival in Texas, Petitioner, in the company of one of his accomplices and Patricia Higdon, disposed of one of the weapons and a suitcase taken from the murder scene. Ms. Higdon later testified that Petitioner threw a .380 caliber automatic pistol off a bridge into water below. Police divers subsequently recovered from the spot described by Ms. Higdon a .380 pistol identified as the murder weapon.

Petitioner and his accomplices were eventually arrested and tried. After deliberating some three and a half hours, the jury returned guilty verdicts on each count. The next day, in accordance with Oklahoma's statutory bifurcated procedure, the same jury was called upon to consider imposition of the death penalty.

In this second phase, neither side called witnesses.[3] Nevertheless, upon the prosecution's motion, the trial court admitted all the evidence from the first phase for consideration by the jury. Counsel for both sides made their summations, and the jury retired to deliberate. In accordance with state procedure, the jury was called upon to make findings of aggravating and mitigating circumstances. The jury found the existence of three aggravating circumstances which applied to all three killings: (1) Petitioner was previously convicted of a felony involving the use or threat of violence to a person; (2) Petitioner knowingly created a risk of death to more than one person; and (3) Petitioner probably would commit criminal acts of violence that would constitute a continuing threat to society. In the case of Ms. Bourque, the jury also found the killing was "especially heinous, atrocious or cruel." No mitigating circumstances were found to exist. Upon these specific findings, the jury returned death verdicts on all three counts.

## II.

■ During an *en camera* discussion with the state trial judge prior to the sen-

---

2. Hypnosis was also used in the interrogation of another witness, but use of the procedure was not disclosed in her testimony. Petitioner predicates an argument of constitutional error on the hypnosis of this witness as well, as we shall discuss in part III.

3. The State did introduce a copy of a judgment of conviction indicating Petitioner's prior conviction of the crime of armed robbery.

tencing phase of the trial, the district attorney moved for an order instructing witnesses "not to express any kind of an opinion, to be asked any kind of a question or express any kind of opinion as to whether or not they feel the death penalty should be imposed." Chief defense counsel responded that he was disposed to call "relatives" of Averil Bourque and Sheila Lovejoy who had "expressed to me a desire to ask the jury not to impose the death penalty in this case."[4] The defense contended this testimony would present proper mitigating factors for the consideration of the jury. The trial court granted the State's motion on the ground that allowing the testimony "would be no more proper" than allowing the State to put on testimony that the penalty should be invoked.

Petitioner contends the refusal of this testimony deprived him of due process, citing *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). He contends that one of the reasons underlying imposition of the death penalty is the sanction of retribution. Assuming the validity of that contention, Petitioner argues testimony of a family member of the victim urging the jury to reject the death penalty would have been strong evidence mitigating that sanction.

In our view, the answer to this issue turns upon the relevancy of the evidence in the context in which it would have been presented. Additionally, we are disinclined towards Petitioner's argument because the obvious consequence of allowing this kind of testimony by the defense would be to permit the State to present witnesses who would testify the penalty should be im-

posed, thus reducing the trial to a contest of irrelevant opinions.

Even though the Oklahoma law mandates presentation of "any mitigating circumstances" in the sentencing phase of a capital trial, Okla.Stat.Ann. tit. 21, § 701.-10, our consideration of the issue in the context of the federal constitution is constrained by the limitation of relevance. In short, the Petitioner's federal constitutional guarantees give him the right to present "any aspect of [his] character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). Yet, the corollary to that rule is the exhortation that the sentencer may not refuse to consider or be precluded from considering "any *relevant* mitigating evidence." *Eddings v. Oklahoma,* 455 U.S. 104, 114, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (emphasis added).

We are thus initially confronted with the question of whether the testimony of a victim's relative who did not wish the death sentence imposed is relevant to the issue of mitigation.[5] As Petitioner acknowledges, relevant evidence is that which tends to make the existence of a fact more probable or less probable than it would be without the evidence. Fed.R.Evid. 401. Translated into terms which relate to the issues before a sentencing jury, relevant mitigating evidence is that which suggests the penalty should not be imposed. Additionally, however, the universe of that evidence is circumscribed by *Lockett's* holding that mitigating evidence is that which applies to either the character or record of the de-

---

4. During the course of the state postconviction hearing, defense counsel testified that he had discussed with Petitioner the possibility of "putting on the one witness who was related to one of the victims." At the same hearing, co-counsel testified: "I believe that this particular witness, who was a sister of one of the victims, ... certainly didn't want him to get the death penalty." From this testimony, we assume the representation that "relatives" would be called was an inaccurate representation and that only one person was available as a witness.

5. Petitioner suggests that because this witness testified in the first phase, she must have known

him well enough to testify to mitigating circumstances beyond her personal desires. While the record indicates Ms. Lovejoy's sister, Mary Bridget. Davis, testified in the first phase as a defense witness, she was not identified as the witness defense counsel had planned to call in the second phase. Moreover, the only testimony the state judge precluded was that of an unidentified relative who was not permitted to testify that the death penalty should not be invoked. That witness was not otherwise prevented by the court's ruling from testifying to any other mitigating circumstances. Petitioner's argument is thus rendered conjectural.

fendant or to any of the circumstances of the offense.

Petitioner seeks to expand the universe with evidence which the state judge correctly perceived to be misdirected. An individual's personal opinion of how the sentencing jury should acquit its responsibility, even though supported by reasons, relates to neither the character or record of the defendant nor to the circumstances of the offense. Such testimony, at best, would be a gossamer veil which would blur the jury's focus on the issue it must decide.

Moreover, allowing any person to opine whether the death penalty should be invoked would interfere with the jury's performance of its duty to exercise the conscience of the community. Because the offense was committed not against the victim but against the community as a whole, in Oklahoma only the community, speaking through the jury, has the right to determine what punishment should be administered.

In short, we cannot agree with Petitioner's contention that *any* testimony a defendant believes would make the jury less likely to return a death verdict must be allowed to satisfy the dictates of federal due process. The broad range of facts admissible under the *Eddings* delineation of mitigating evidence must focus on the persona of the defendant or on the fabric of the crime of which he has been convicted. We can find no justification for broadening that focus.[6]

Indeed, the Supreme Court has recently underscored the need for narrowing the scope of the evidence affecting the sentencing decision by preventing the state from disclosing the impact the crime has on the victim's surviving relatives. In *Booth v. Maryland*, —— U.S. ——, 107 S.Ct. 2529, 2533, 96 L.Ed.2d 440 (1987), the Court declared that admissibility of sentencing evidence must be made to depend upon whether it "has some bearing on the defendant's 'personal responsibility and moral guilt.'"

*Quoting Enmund v. Florida*, 458 U.S. 782, 801, 102 S.Ct. 3368, 3378, 73 L.Ed.2d 1140 (1982). The Court pointed out that the jury's sentencing decision must be focused upon the defendant as a "uniquely individual human bein[g]." *Booth*, 107 S.Ct. at 2533 (*quoting Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976)). Hence, the Court added, factors which are unrelated to the culpability of the defendant and which focus on the impact that the defendant's crime has on others are irrelevant to the issue of punishment and might result in the jury reaching its verdict in an arbitrary manner.

More in point here, the Court also observed that "the degree to which a family is willing and able to express its grief is irrelevant to the decision whether a defendant, who may merit the death penalty, should live or die." *Booth*, 107 S.Ct. at 2534. Even though expressed in a case in which the direction of the evidence was favorable to the prosecution, we believe the lesson taught in *Booth* is equally applicable here because the underlying reasoning for limiting the scope of the evidence allows for no distinction between misdirected evidence offered by either party. Indeed, the Court stated, "[n]or is there any justification for permitting such a decision [life or death] to turn on the perception that the victim was a sterling member of the community rather than someone of questionable character." *Id.*

In sum, the jury must be provided with evidence that will lead it to a principled determination without any hint of arbitrariness. We conclude the testimony offered by the defense in this instance was calculated to incite arbitrary response, thus it was properly excluded, and the exclusion provides no basis for granting relief.

### III.

#### A.

◼ Petitioner claims that the use of hypnosis by the State to enhance the recall

---

**6.** Petitioner also argues that proscription of the opinion evidence was in violation of Okla.Stat. Ann. tit. 21, § 701.10; hence he was denied due process. Oklahoma has interpreted the statute

to apply only to relevant evidence. *Chaney v. State*, 612 P.2d 269 (Okla.Cr.1980). Since Petitioner's basic premise is invalid, we will not give further consideration to the argument.

of two persons who later testified constitutes "highly prejudicial constitutional error." Advocating a *per se* harm rule for exclusion of such evidence, Petitioner maintains that dangers inherent in the use of hypnosis as well as the denial of the right of confrontation mandate relief from the judgment of conviction.

Terry Henderson was hypnotized to aid in her recall of precisely what she observed as she drove past the victims' house on the night of the murder. At trial, Ms. Henderson was examined by both sides about the hypnotic session, and the jury was given the opportunity to assess her credibility as a consequence. Nonetheless, on appeal, the Oklahoma Court of Criminal Appeals determined that her in-court identification of Petitioner was inadmissible, but due to the overwhelming evidence against him, the court concluded the error was not grave enough to require reversal. *Robison v. State*, 677 P.2d 1080 (Okla.Cr.1984). Petitioner contests this result, claiming that Ms. Henderson was the only eyewitness who placed him at the scene of the murder; hence, her testimony could not be considered harmless.

To properly understand this issue, one must put Ms. Henderson's testimony in context. Petitioner suggests in his brief that Ms. Henderson was unable to identify him until she was hypnotized. The record indicates otherwise.

Before Ms. Henderson made any in-court identifications, defense counsel asked for a bench conference. That conference was not reported, but because the trial judge immediately convened a chambers hearing at which defense counsel conducted voir dire of Ms. Henderson, we must assume Petitioner's trial counsel anticipated and objected to the identification.

During the ensuing examination, Ms. Henderson related that she had contacted the sheriff's office and reported she had seen a vehicle emerging from the driveway of the victims' home. During an interrogation which followed, she described "the kind of car it was" and its "actions" in the driveway. She added, "also I told them that I had a brief glance of the man on the passenger side." When asked why she was placed under hypnosis, she stated, "Well, they just said they might—that I might could (sic) remember a few details about possibly the vehicle and such that I had seen that night."

Ms. Henderson also stated that she could remember what she was asked under hypnosis, and she recalled, "They told me most—most of the things they said was to tell what you saw and then they asked me some brief questions about the vehicle and such, but mostly it was telling what I seen, the actions and the car I had seen." [7] Then the following occurred:

Q. While under hypnosis do you recall what description of any individuals you gave?

A. Yes. I—the same description that I've had all along was that he was dark hair, mustache. Possibly a beard. I didn't know at the time whether he had a beard.

. . . .

Q. Miss Henderson, it's very important that you try to recall whether or not you—how you described the individuals in this vehicle ...?

A. Well, as I say (sic) before, I cannot describe the driver because it was dark that night, and my lights did not catch the driver but I did see the view of the man on the passenger side of the car and he had shoulder—a little bit around the shoulder length hair, dark, brushed back from the face, and mustache and sideburns, some sideburns and I'm not for (sic) sure about the beard. And the reason I'm not for (sic) sure is because of his shoulder, the way he was turned it blocked that part of the face off. He had a slender face.

. . . .

Q. All right. Do you remember how you described the passenger at the hypnosis session?

7. Petitioner suggests this answer indicates the possibility officers prompted Ms. Henderson's recall. We do not agree. Taking the statement in context, we conclude it was an inarticulate reference to instructions given by the interrogator to recall her observations.

A. Yes. The same way I've described him to you here.

Defense objections to the testimony of Ms. Henderson were overruled, and testimony was resumed before the jury. In the course of direct examination, Ms. Henderson described the passenger in the car in the same way she had earlier in her voir dire. She then identified Petitioner as that passenger. Cross-examination on her identification took this course:

Q. Can you tell this jury, Miss Henderson, with all certainty that you can muster that Olan Randle Robison is the guy you saw in that car on the night of June the 12th?

A. At this time there is no doubt in my mind.

. . . .

Q. All right. Do you recall me asking you that question at Preliminary Hearing about whether you can say for (sic) positive that—

A. Yes, I do.

Q. Do you remember the answer that you gave?

A. Yes, I do.

Q. And what did you say?

A. I said that—well, I'm not for (sic) sure of the exact words I used, I said that he resembled him, but I wasn't for (sic) positive, and the reason I said that was because I had a question about the beard.

Q. And what question did you have about the beard?

A. Because I couldn't figure out why if I could tell there was a mustache, why I couldn't tell there was a beard, since it would be so noticeable, but now I know why.

Q. Do you know the person—but you still don't know whether that person had a beard or not do you?

A. No, because you couldn't see that part of his face. It was covered by his shoulder.

As we now perceive this record, Ms. Henderson's testimony was confusing, but not confused. In her mind, she recalled the person she saw in the passenger seat of the vehicle, and she was hesitant only about whether he was bearded. When she realized the person's shoulder hid his entire face from view, she understood and resolved the cause of her perplexity. We find nothing in the record indicating that Ms. Henderson's resolution was a consequence of hypnosis or that her identification of the Petitioner was the product of the hypnotic session.

Nonetheless, the Oklahoma Court of Criminal Appeals decided as a matter of state law that the admission of her testimony was erroneous, holding that statements made under hypnosis are inadmissible when offered as the truth. *Robison*, 677 P.2d at 1085. Yet, viewing the entirety of the evidence, the court concluded the admission of Ms. Henderson's in-court testimony was harmless. With that conclusion we agree beyond a reasonable doubt, *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Wiley v. Rayl*, 767 F.2d 679 (10th Cir.1985).

If one considers the direct and inferential evidence of Petitioner's guilt, one must conclude that at best the testimony of Ms. Henderson was cumulative. Indeed, her identification even pales in contrast with Petitioner's incriminating admissions to his friends detailing the crime and his participation. Those admissions, together with his appearance in Ms. Briscoe's home in an agitated state attired in a bloodstained shirt and boot possessing pictures of two of the victims; his precipitous flight to Texas; and his possession and disposal of the murder weapon were strong circumstances of his guilt. We therefore find no grounds for relief on this issue.

**B.**

■ The testimony of Ms. Higdon represents a different problem, however. The trial testimony did not disclose the fact of her pretrial hypnosis, although defense counsel was in possession of a report indicating the fact of the hypnotic session. Thus, the testimony of Ms. Higdon at least nominally did not violate Oklahoma's exclusionary rule.

Prior to the hypnotic session, Ms. Higdon had been interviewed and had described a number of details surrounding the night of the crime and subsequent events. In part, she told of being in a car with Petitioner and one of his accomplices when Petitioner disposed of the murder weapon. Ms. Higdon was able to give only a general description of the locale where the gun was thrown away; therefore, interrogators attempted to enhance her recall of that place through the medium of hypnosis.

The results of that session were at best equivocal because her statement did not vary materially from the statement she had given previously. Moreover, the habeas court found that the mere fact Ms. Higdon was hypnotized did not render her testimony prejudicial to Petitioner because she attempted to "slant" her testimony at trial to favor Petitioner. There is ample support in the record for this conclusion. Indeed, other than the academic argument that admission of the testimony of one exposed to hypnosis is *per se* harmful, Petitioner has failed to demonstrate prejudice resulting from Ms. Higdon's posthypnotic testimony.

While Petitioner's arguments regarding the forensic use of hypnosis have some appeal, we cannot accept the suggestion that constitutional error arises from the very fact a person testifies after a hypnotic session in which the person's recall is examined. Indeed, in a case decided in the recently concluded term, the Supreme Court leads us to that conclusion.

In *Rock v. Arkansas*, —— U.S. ——, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), in which a defendant's use of her own posthypnotic testimony was prevented by a state's proscription of hypnotically refreshed recollection, the Supreme Court considered the *per se* rule Petitioner advocates here. Although the issue before the Court was predicated on a defendant's constitutional right to testify in her own defense, the Court noted the state followed a rule which makes inadmissible *any* posthypnotic testimony. The Court stated:

> In establishing its *per se* rule, the Arkansas Supreme Court simply followed the approach taken by a number of States that have decided that hypnotically enhanced testimony should be excluded at trial on the ground that it tends to be unreliable....
>
> We are not now prepared to endorse without qualifications the use of hypnosis as an investigative tool; scientific understanding of the phenomenon and of the means to control the effect of hypnosis is still in its infancy.... A State's legitimate interest in barring unreliable evidence [however] does not extend to *per se* exclusions that may be reliable in an individual case.

*Rock*, 107 S.Ct. at 2712, 2714.

We thus conclude that use of any posthypnotic testimony is not *per se* a constitutional error. A reviewing court must determine whether safeguards have been employed to insure reliability of the testimony to make it admissible. *Id.* The state court found the existence of the safeguards in the state-mandated procedure under which Ms. Higdon was examined.[8] In the absence of contrary evidence (and we find none here), this finding is entitled to a presumption of correctness. 28 U.S.C. § 2254(d); *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982).

It is noteworthy that the testimony of Ms. Higdon which Petitioner counts as "extremely damaging" was not the subject of the hypnotic session. There is no evidence to even suggest that this testimony was made unreliable by hypnosis; therefore, in light of *Rock v. Arkansas*, we cannot accept Petitioner's hypothesis that the introduction of her testimony resulted in constitutional error.

## IV.

Petitioner contends that the courtroom conduct of the state district attorney

---

8. The state judge found that (1) there was a written record of the "substance" of Ms. Higdon's prehypnotic recall; (2) that record was preserved; (3) the trial testimony did not vary from the prehypnotic statement; (4) the hypnosis was "performed in a manner designed to minimize danger of contamination"; (5) a written record of the hypnotic session was made and maintained.

deprived him of a fair trial. He maintains the prosecutor "repeatedly engaged in outrageously improper argument and conduct" throughout his remarks to the jury in both phases of the trial. Petitioner states the prosecutor improperly attempted to provoke the jury's sympathy for the victims.[9] Included in the conduct cited are references to the district attorney's suggestion that the jury "turn the coin" on the Petitioner so that every time the defense mentioned the Petitioner, the jury would think of the victims. Petitioner argues the prosecutor attempted to blunt the jury's responsibility by arguing Petitioner had "punched his own ticket."

The standard upon which we are to judge the issue of prosecutorial misconduct is set forth in *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).[10] In that case, the Court held that prosecutorial misconduct in a state court violates a criminal defendant's federal constitutional rights only if the prosecutor's actions so infect the trial with unfairness as to make the resulting conviction a denial of due process. Viewing the Petitioner's contention in the light of this standard, the federal district court concluded that even if the prosecutor's actions, which were indeed questionable, had been halted by the trial court, there is no reasonable probability the outcome of the trial would have been different. We agree, and therefore conclude, as a matter of federal law, the required infectious conduct was not present in this case. *Coleman v. Brown*, 802 F.2d 1227 (10th Cir.1986).

As we noted, the evidence against Petitioner was strong. Because of that evidence, we are unable to say, as a matter of federal constitutional law, that the antics of the prosecutor or his statements to the jury could have tipped the scales in favor of the prosecution. Indeed, as we shall later discuss, defense counsel testified at the state postconviction hearing that he thought the district attorney was prejudicing himself in the eyes of the jury by his conduct. Our review of the record leads us to the conclusion that surmise was not unjustified. Nevertheless, within the confines of our scope of review, and viewing the conduct of the prosecutor in the light of all surrounding circumstances, we conclude because of the overwhelming nature of the evidence aligned against the Petitioner, the jury must have been swayed by the facts and not the conduct of counsel, even though that conduct was questionable.

## V.

■ Petitioner has challenged the Oklahoma statute permitting a jury to find as an aggravating circumstance that a killing was "especially heinous, atrocious, or cruel." We have held the statute constitutionally deficient in our *en banc* ruling in *Cartwright v. Maynard*, 822 F.2d 1477 (10th Cir.1987). Accordingly, the death sentence given petitioner for the killing of Averil Bourque cannot stand. Nonetheless, we do not believe this consequence mandates total relief.

The constitutional implications of the invalid statute exist only for the sentence to which the statute was applied. Since the jury was not instructed to consider whether the killings of the other two victims were "especially heinous, atrocious, or cruel," its verdicts on those crimes cannot be impeached on that ground. Following oral argument here, Petitioner has contended the instruction regarding the killing of Averil Bourque had a "spill-over" effect on the jury, thus necessitating vacation of the remaining verdicts. We find no justifica-

---

**9.** We note in passing that one example of allegedly shameless theatrics appears at least justifiable by the record. In the closing argument in phase two, the district attorney threw himself on his knees before the jury to illustrate the attitude of one of the victims at the time of her death. It is suggested that he was trying to indicate she was pleading for her life, but the record indicates he was trying to demonstrate her posture at the time the bullet entered her body. This demonstration is supported by the testimony of the prosecution's pathologist who indicated the course of the bullet through the victim's body suggested she might have been postured on her knees when shot.

**10.** *See also Darden v. Wainwright*, 477 U.S. 187, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

tion for that argument in the record, hence we decline the invitation to so rule.

## VI.

### A.

Petitioner raises the effectiveness of his trial and appellate counsel, claiming because of their failures to raise or preserve many issues, he was denied his right to counsel. Petitioner was represented on appeal to the Court of Criminal Appeals by counsel different from those who represented him at trial.

Our review of this issue is guided by *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), which held that in order to succeed on a claim of incompetent counsel, a defendant must show that counsel's performance was deficient and that the deficiency prejudiced his defense. The first component of the test requires the petitioner show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The second component requires a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* The measure against which these components are judged is that of an objective standard of reasonableness. Judging the reasonableness of counsel's performance requires that:

> every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (citation omitted). The Court instruct-

ed that one who contends counsel was ineffective must first specifically delineate the acts or omissions of counsel which were not reasonably competent. Then, a reviewing court must judge those specific instances in light of all circumstances in the case in which those acts or omissions were allegedly outside the wide range of professionally competent assistance. Within the context of that review "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Finally, the Court added, even if counsel's actions do not meet the standard of reasonableness, a judgment of conviction must not be set aside if those actions had no effect on the judgment. That result can occur only when the defendant shows "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. This test is not to be made in a vacuum, however, as the Court added the reviewing court must presume, in the absence of evidence to the contrary, that the judge or jury acted according to law. Moreover, the determination of the ineffectiveness claim must be governed by the totality of the evidence before the jury.

■ Petitioner has met the first burden of particularizing the errors of counsel. He claims trial counsel was inept in failing to object to the actions of the prosecutor; in failing to object to the testimony of hypnotized witnesses; and in failing to make objections necessary to preserve issues for appeal. Petitioner also argues trial counsel failed to properly prepare for and conduct the second phase proceedings and, in particular, in failing to call witnesses in mitigation. After reviewing the record, we find some of these contentions factually deficient.

First, as previously noted, trial counsel did object to the testimony of Ms. Henderson. Unfortunately, the colloquy between court and counsel was not reported; therefore, it is impossible to determine

the argument made in support of the objection, but it is clear the trial court allowed Ms. Henderson's testimony over an objection based upon her hypnotic interview. Second, we believe it a mischaracterization of the record to claim trial counsel called no witnesses in the second phase. Even though it was on the prosecution's motion, *all* the evidence in the first phase, including that given by defendant's witnesses who testified about his lack of sobriety on the night of the crime and the physical effects that alcohol and chemical ingestion had on his ability to function, was admitted in the second phase. It was defense counsel's strategic choice to predicate his plea for mitigation upon Petitioner's diminished capacity, and evidence in support of that plea was admitted, allowing counsel to make the argument to the jury.

Petitioner now claims other witnesses who would have testified to his loving and peaceful nature could have been called. Yet, during the state postconviction proceedings, trial counsel testified he did not want the jury to know of Petitioner's criminal history; therefore, he eschewed making Petitioner's character an issue. In light of the cross-examination of those suggested witnesses conducted at the postconviction hearing, the stratagem was not unfounded. Those called to testify were cross-examined about their knowledge of his criminal history, his predilection for intoxicants, his apparent inability to hold employment, and his failure to provide support for his minor children. All claimed a general lack of knowledge of those facts, even though they are evident in the testimony of others. In short, it is evident the mitigating value of this line of testimony would have been substantially, if not altogether, diminished through impeachment. Accordingly, we cannot say trial counsel was inept because he failed to call Petitioner's family members and friends. *Cf. Coleman*, 802 F.2d at 1235.

Trial counsel also testified that he did not object to the tactics of the district attorney for two reasons. First, he did not think the prosecutor was helping his case by his actions. Indeed, he thought to the contrary. Second, he believed the jury would not look favorably on objections. Whether this reasoning was valid is largely problematical at this juncture, but looking at the situation at the time it was faced by counsel, the reasons for his failure to object are not unfounded.

Despite Petitioner's arguments, we are unable to say that even if trial counsel had made the suggested objections, had called the suggested witnesses, and had done those things hindsight suggests he should have done, the jury would have entertained a reasonable doubt regarding Petitioner's guilt. Accordingly, we cannot conclude he was deprived of adequate representation by his trial counsel. *Cartwright v. Maynard*, 802 F.2d 1203 (10th Cir.1986), *on rehearing en banc*, 822 F.2d 1477.

### B.

Petitioner also raises the lack of effectiveness of his state-appointed appellate counsel. The federal district court found "appellate counsel's failure to raise every non-frivolous ground for relief does not, in itself, constitute ineffective assistance of appellate counsel." With that general proposition we agree, but there is a nagging circumstance involved here that makes the habeas court's conclusion unsatisfying.

We have already stated the antics of the prosecutor did not rise to the dimensions of constitutional error. Nevertheless, it is unassailable that similar antics, indeed even those previously performed by the same prosecutor, have been held by the Oklahoma Court of Criminal Appeals to warrant appellate relief as a matter of state law. In *Scott v. State*, 649 P.2d 560 (Okla.Cr.1982), district attorney Burns (the prosecutor here) was chided for improperly appealing to the sympathies of the jury and representing himself as the spokesman for the deceased in a manner similar to his conduct in this case. Acting in its supervisory capacity over the conduct of state trials, the court granted relief to the defendant, even though objections to the arguments were *sustained* by the trial court, because the Court of Criminal Appeals re-

fused to "close our eyes to such behavior." *Scott,* 649 P.2d at 564. In *Tobler v. State,* 688 P.2d 350 (Okla.Cr.1984), again, acting in its supervisory capacity, the court granted a new trial because Mr. Burn's pleas for sympathy through the use of his "turn of the coin" argument so infected the fairness of the first trial reversal was mandated *as a matter of fundamental error*! "The behavior of District Attorney Tony R. Burns can only be termed outrageous." *Tobler,* 688 P.2d at 353. While we cannot and would not put ourselves in the position of an Oklahoma court ruling on this issue, nor can we hypothesize the outcome in this instance, it would nevertheless facially appear a reversal is conceivable, had Petitioner's appellate counsel raised the issue.

Two circumstances persist as further concerns, however. First, we do not know why the issue was not raised on the appeal from the judgment of conviction.[11] Appellate counsel was not called at the state postconviction hearing, and the habeas court's treatment of the issue eliminated the possibility of calling him in the federal court. Yet, the issue still nags, and it does not appear frivolous. Second, perhaps appellate counsel believed trial counsel's failure to object and thus preserve the issue was a compelling reason for not challenging the prosecutor's conduct.

We cannot, however, ignore the fact that this same prosecutor engaged in substantially the same conduct *after* the Oklahoma state courts had specifically determined that the conduct was infirm. The Oklahoma Court of Criminal Appeals said on July 20, 1982:

> The vindication of community outrage has been criticized by this Court recently in *Franks v. State,* 636 P.2d 361 (1981). The statements now before us are reprehensible for the reason that the prosecutor has attempted to cast himself in a light which is inaccurate. He does not represent the victim, the jurors, nor the interests of society. His duty is to prosecute the defendant for a crime against the victim, in violation of society's laws, and in which the jurors are the determiners of fact.

*Scott,* 649 P.2d at 564. In this case Prosecutor Burns repeated the tactics denounced months before in *Scott,* saying:

> I asked you in the beginning of this trial to turn that coin over and you think about the three victims in this crime; when he says Randle Robison, I hope that you remember the names of Averil Bourque, Robert Leon Swinford and Sheila Julie Lovejoy. Thank you. (Tr. 1206)

> It is personal between Randle Robison and those three dead people, and I speak for those three dead people right now because there is nobody else to speak for them, and I want you to remember their names. When you go into that jury room, and if you can vote not for the death penalty, then I want you to remember the names of those three people because there is [sic] three lives to weigh against one, and there is not just three lives, its the way their were taken. (Tr. 1218)

> The last thing I will say to you in this trial, because this case is yours right now, the last thing I'll say to you in this trial are the names of those three people. This is not my case. It's not the case of the police officers who worked so hard in it. Robert Leon Swinford, Sheila Julie Lovejoy, and Averil Borque. Thank you your Honor. (Tr. 1219)

Under these circumstances—rare in the sequence of litigation—where the Oklahoma court had granted other defendants relief from the same kind of conduct by the same district attorney, we must inquire why appellate counsel chose not to raise the issue of prosecutorial misconduct. Even though trial counsel did not object to that conduct, similar behavior was regard-

---

**11.** We note here that Respondent argues Petitioner did not raise the issue of the adequacy of his appellate counsel in the appeal from the state denial of postconviction relief. That argument is not supported by the record. The copy of the "Petition in Error" filed with the Oklahoma Court of Criminal Appeals, which is appended to the amended petition for a writ of habeas corpus, contains a claim that the state court erred in failing to grant relief on the ground "that petitioner was denied his right to effective assistance of counsel on appeal."

ed as plain error by the Oklahoma Court of Criminal Appeals. *Tobler*, 688 P.2d at 353. Indeed, it is almost inconceivable to assume an appellate court's willingness to stand upon a mechanistic application of a procedural rule to thwart consideration of a legitimate appellate issue in a death penalty case. Without an answer to our inquiry, we deem it impossible to perform an adequate *Strickland* test.

At this juncture, it is important to interject consideration of the issue of procedural bypass. We originally have noted our conclusion that Respondents have not preserved the issue for this case by failure to appeal the district court's adverse ruling. Nonetheless, we would simply note here even were the defense properly before us, we would maintain our concern over the issue of appellate counsel's representation based on the present record. Because an exegesis on the subject is presently unnecessary, we simply state that it is our belief that Petitioner has met the cause and actual prejudice test established in *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and reiterated in *Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984). The allegation of inadequacy meets the cause test, and the facial probability of a reversal meets the actual prejudice test with, at least, a degree of sufficiency to mandate further inquiry in the context of this case. *Compare Andrews v. Shulsen*, 802 F.2d 1256 (10th Cir. 1986).

Because of our concern, we believe the federal district court should have made a factual inquiry into the reasons behind appellate counsel's failure to raise what might be viewed a forgone ground upon which a new trial could have been obtained. At the same time, we have examined the remaining issues raised by the Petitioner and conclude they were properly decided by the district court for the reasons expressed in its opinion.

The judgment of the district court is AFFIRMED IN PART and REVERSED IN PART and REMANDED for the purpose of conducting an evidentiary hearing into the reasons why Petitioner's state appellate counsel did not raise the issue of prosecutorial misconduct in the state appeal and for further determination of the issue of adequate representation in light of the evidence produced. In addition, the district court shall enter a declaratory judgment that the death sentence on the count relating to Ms. Bourque is invalid and unenforceable. *Cf. Chaney v. Brown*, 730 F.2d 1334, 1358 (10th Cir.1984).