986 F.2d 1427
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 David Paul HAMMER, Petitioner-Appellant,
v.
James L. SAFFLE; Attorney General State of Oklahoma,
Respondent-Appellee.
 No. 91-6390.
 United States Court of Appeals, Tenth Circuit.
 Feb. 17, 1993.
 
 Before PAUL KELLY, Jr., Circuit Judge, BARRETT, Senior Circuit Judges, and OWEN*, District Court Judge.
 ORDER AND JUDGMENT**
 BARRETT, Senior Circuit Judge.
 
 
 1
 David Paul Hammer appeals from the orders and judgment of the district court adopting the report and recommendations of the magistrate judge and denying his petition for habeas corpus.
 
 
 2
 Hammer was charged in state court with kidnapping, robbery with firearms, and shooting with intent to kill, after former conviction of two or more felonies. The facts underlying the charges were summarized in Hammer v. State, 760 P.2d 200, 201-02 (Okla.Crim.App.1988):
 
 
 3
 On October 28, 1988, Thomas Upton was driving in northwest Oklahoma City and was stopped at a traffic light, when appellant stuck a gun in the window of Upton's vehicle, got into the car, and ordered him to drive to a specified motel. Upon arriving at the motel, Upton was ordered to an upstairs room, where he was told to empty his pockets. During the time in the motel room, appellant would appear calm for a short period of time, but suddenly become agitated and violent. This mood change occurred several times throughout the evening. At one point, Upton unsuccessfully attempted to wrestle the gun away from appellant, but appellant hit him with the gun, threatened to kill him and ordered him into the bathroom.
 
 
 4
 Shortly thereafter, appellant forced Upton at gun point to leave the motel room and to drive to a deserted area on Sarah Road. When they arrived, he forced Upton to disrobe and lie face down on the road. Appellant then fired three shots, in rapid succession, into the head and face of Upton. Unbelievably, Upton got up and chased appellant, who fled in Upton's car. Upton then walked three miles and was picked up by a passing motorist who took him to the hospital.
 
 
 5
 Hammer was arrested but escaped from custody. He was subsequently arrested in California and transferred back to Oklahoma by Officers Richard Runyon and Lynn Cummings for trial.
 
 
 6
 When he [Hammer] was being transferred back to Oklahoma, he was placed in the custody of two Oklahoma City police officers. Appellant was given his Miranda warnings as soon as he was turned over to the officers. The officers transported him to the airport and placed him in a holding cell for one and one half hours to await the arrival of the airplane. During the flight, one officer [Richard Runyon] asked appellant about the kidnapping and robbery. Appellant stated that he got into Upton's car at a stoplight. The officer also asked appellant if he shot Upton, to which he replied, "I did shoot the guy in Oklahoma City [but] I don't want to tell you anything more about it." After appellant made this statement, the officer stopped all discussion.
 
 
 7
 Id. at 202.
 
 
 8
 Prior to trial, Hammer requested that he be allowed to represent himself. Hammer proceeded pro se throughout the first phase of his trial, which was bifurcated in accordance with the laws of Oklahoma. Thereafter, the court, following Hammer's request, appointed stand-by counsel to represent him during the second phase of the trial.
 
 
 9
 At trial, Thomas Upton, the victim, positively identified Hammer as his assailant. Officer Runyon testified relative to Hammer's confession during their airplane flight back to Oklahoma. Officer Cummings did not testify. Hammer was convicted and sentenced to 400 years imprisonment on each of the three counts, with the sentences to run consecutively.
 
 
 10
 On appeal, Hammer alleged, inter alia, that: his confession was improperly admitted in violation of his Miranda rights; the prosecutor's comments relative to Upton's testimony constituted fundamental error; and the State had violated his rights under Brady v. Maryland, 373 U.S. 83 (1963) by failing to disclose prior to trial that they intended to use his admissions to Officer Runyon during their flight back to Oklahoma.
 
 
 11
 In affirming Hammer's convictions, the Court of Criminal Appeals of Oklahoma held that: Hammer's confession, made a few hours after he was given his Miranda warnings, was admissible; the prosecutor's comments during closing arguments did not give rise to fundamental error; Hammer's Brady rights were not violated because the statements were inculpatory rather than exculpatory and Hammer had knowledge that the State intended to use the admissions. Hammer.
 
 
 12
 Hammer subsequently filed an application for post-conviction relief which was denied. The Court of Criminal Appeals of Oklahoma affirmed this denial. Thereafter, Hammer filed his petition for habeas corpus herein.
 
 
 13
 Within his petition, Hammer alleged that the prosecutor had violated his constitutional rights by failing to disclose favorable evidence in violation of Brady; that an alleged confession had been illegally admitted into evidence; and that he had been denied a fair trial by prosecutorial misconduct. Counsel was appointed to represent Hammer and an evidentiary hearing was conducted before a magistrate judge on the Brady issue.
 
 
 14
 During the course of the hearing, Hammer called nine witnesses, including Lynn Cummings and the district attorneys who had prosecuted him. Cummings testified that he had accompanied Officer Runyon to California to pick up Hammer; he had read Hammer his Miranda rights; he had not heard Hammer's confession but he had no reason to believe that it was not made; and he did hear bits and pieces of the conversation between Hammer and Runyon which included the words "shooting" or "shot" and "Oklahoma City." The district attorneys both testified that they had maintained an open-file policy and that Hammer had access to all of the state records in the file during the preparation of his case.
 
 
 15
 Following the hearing, the magistrate judge entered a detailed report and recommendation finding: Brady evidence must be expressly exculpatory; inculpatory or neutral statements are not Brady evidence; Hammer's real complaint went to the notice afforded him relative to the confession; however, this was an evidentiary matter rather than a Brady allegation; and no Brady violation had occurred.
 
 
 16
 In its order accepting in full the report and recommendations of the magistrate judge, the court found: Hammer's objections to the magistrate judge's report and recommendation are without merit; Cummings' testimony was clearly inculpatory rather than exculpatory and was in no way favorable to Hammer; the facts indicate that Cummings had apprised Hammer of his Miranda rights prior to boarding the plane; and the evidence relied upon by Hammer "is simply not enough to support a Brady violation." (R., Vol. I, Tab 111 at p. 6.)
 
 
 17
 In its order denying Hammer's petition for habeas corpus, the district court found: Hammer's Brady allegations were fully addressed in the magistrate judge's report and recommendations adopted by the court in its prior order; Hammer's allegation that his "confession" was not disclosed to him prior to trial is simply an evidentiary or procedural issue as to whether the trial court would have granted Hammer a continuance, if requested; the trial court's action in not granting a continuance sua sponte was not so arbitrary or fundamentally unfair as to violate Hammer's constitutional rights; habeas corpus relief for prosecutorial misconduct is available only when the conduct is so egregious in the context of the entire trial that it renders the trial fundamentally unfair; it is not enough that the remarks complained of were undesirable or even universally condemned but rather whether the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process; and the prosecutor's comments did not affect the jury's ability to weigh the evidence fairly.
 
 
 18
 On appeal, Hammer contends that the district court erred in dismissing his habeas corpus petition and rejecting his arguments that: his Brady rights were violated by the prosecution's failure to disclose information favorable to him prior to trial; his Fifth Amendment rights were violated by the admission of his alleged confession; and he was denied his fundamental right to a fair trial by prosecutorial misconduct.
 
 
 19
 We review the factual findings of the district court in a habeas corpus proceeding under the clearly erroneous standard. United States v. Buchanan, 891 F.2d 1436, 1440 (10th Cir.1989), cert. denied, 494 U.S. 1088 (1990). However, "28 U.S.C. § 2254(d) requires the federal courts to accord state court factual findings a presumption of correctness." Hernandez v. New York, --- U.S. ----, 111 S.Ct. 1859, 1869 (1991). In Case v. Mondragon, 887 F.2d 1388, 1392-93 (10th Cir.1989), cert. denied, 494 U.S. 1035 (1990), we held:
 
 
 20
 The general rules are not in doubt. Explicit and implicit findings by state trial and appellate courts "shall be presumed to be correct," 28 U.S.C. § 2254(d), unless one of the seven factors listed in section 2254(d) are present, or the federal court concludes that the state court findings are not supported by the record....
 
 
 21
 The presumption applies to basic, primary, or historical facts and the inferences that can properly be drawn regarding them....
 
 
 22
 No presumption of correctness attaches to legal conclusions or determinations on mixed questions of law and fact. Those are reviewed de novo on federal habeas corpus.... However, the presumption of correctness will continue to apply to any findings of fact underlying mixed questions, typically 'ultimate' constitutional issues such as due process.... This will even be the case when, as here, those findings might resolve or dispose of the 'ultimate' mixed question.
 
 I.
 
 23
 Hammer contends that the district court erred in dismissing his habeas corpus petition and rejecting his argument that his Fifth, Sixth and Fourteenth Amendment rights were violated by the prosecutors' failure to disclose information favorable to him prior to trial. Hammer argues that his rights under Brady were violated by the prosecution's suppression of evidence favorable to him.
 
 
 24
 Hammer contends that: the prosecution acted in violation of his rights under Brady when it failed to disclose that Officer Runyon would testify relative to his confession; it was not until the Brady hearing on his habeas corpus petition that he became aware of the material inconsistencies between Runyon's and Cummings' testimony relative to his alleged confession; "[t]he most glaring credibility problem for Officer Runyon is indicated by Officer Cummings, i.e., though he was present as a transporting officer for Petitioner on the plane from Los Angeles, he did not hear Petitioner give a confession as asserted by Officer Runyon." (Petitioner's Brief at p. 11); and Officer Cummings' testimony, in many crucial ways, impeaches Officer Runyon's testimony.
 
 
 25
 The government responds that Hammer's claim is, specifically, that the prosecution failed to provide the name and existence of Officer Cummings. The government argues that Hammer was not deprived of any rights under Brady, when, as here: the prosecuting attorney gave Hammer complete access to the case file; Hammer failed to establish a Brady violation by showing that evidence was suppressed, that the evidence was favorable to his defense, or that the suppressed evidence was material; even if the requested evidence had been in the state's possession, it would not have served to exculpate Hammer or reduce his sentence because the evidence against Hammer, including Upton's positive identification and Hammer's confession to Officer Runyon, was very strong.
 
 
 26
 "A fair analysis of the holding in Brady indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have effected the outcome of the trial." United States v. Agurs, 427 U.S. 97, 104 (1976). "It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.... If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is not justification for a new trial." Id. at 112-13. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985).
 
 
 27
 Disclosure under Brady and its progeny is mandated only if the evidence is both material and exculpatory. In United States v. Comosona, 848 F.2d 1110, 1115 (10th Cir.1988), we held:
 
 
 28
 Comosona's theory seems to be that even though none of the statements was exculpatory, the discrepancies contained in the statements could have given rise to an inference.... We decline to extend the scope of the Brady decision so far. The Government has no obligation to disclose possible theories of the defense to a defendant. If a statement does not contain any expressly exculpatory material, the Government need not produce that statement to the defense. To hold otherwise would impose an insurmountable burden on the Government to determine what facially non-exculpatory evidence might possibly be favorable to the accused by inferential reasoning.
 
 
 29
 Brady does not require the government to disclose every statement to the defense; a Brady violation occurs only if material and exculpatory evidence is suppressed. Applying these standards here, we hold that Hammer has failed to establish a violation of his rights under Brady. Our holding is in accord with the findings of the Court of Criminal Appeals of Oklahoma, which, under 28 U.S.C. § 2254(d), are "presumed to be correct."
 
 
 30
 [T]he record shows that appellant was, in fact, notified of these statements [Hammer's admissions to Officer Runyon on the airplane] five days before trial, and that the State offered to continue the trial to give appellant sufficient time to prepare. Appellant refused and elected to proceed with trial. Second, the admissions were inculpatory rather than exculpatory. Brady only requires the defendant to be given any information which tends to exculpate him.... Third, as this Court held in Gregg v. State, 662 P.2d 1385, 1388 (Okla.Crim.App.1983), a prerequisite for relief for nondisclosure is that the defendant not have independent knowledge of the evidence. Here, not only did appellant have knowledge that the State intended to use the admissions, but he was clearly aware of the contents of the statements because they were made by him.
 
 
 31
 Hammer at 204.
 
 II.
 
 32
 Hammer contends that the district court erred in dismissing his petition and in rejecting his argument that his Fifth Amendment rights against self incrimination were violated by the trial court's admission of his alleged confession to Officer Runyon. Hammer argues that he has steadfastly denied ever confessing to Officer Runyon; there was no written acknowledgement of the confession; and since he did not receive any Miranda warnings, the confession cannot be a knowing and voluntary waiver of his rights against self incrimination. Hammer argues that the court's error was compounded when, as here, he was proceeding pro se.
 
 
 33
 The government responds that the evidence in this case clearly establishes that Hammer was given his Miranda warnings and that he subsequently freely and voluntarily confessed to Officer Runyon. We agree. See (R., Vol. I, Tab 45, Transcript of Trial, Oklahoma County District Court, pp. 137 and 140) (Officer Runyon's testimony relative to Hammer being advised of his Miranda rights and Hammer's subsequent confession); Hammer, 760 P.2d at 202 (specific findings that Hammer was advised of his Miranda rights and thereafter confessed to Officer Runyon); (R., Vol. II, Transcript, Evidentiary Hearing on Petition for Habeas Corpus, pp. 64 and 85) (Officer Runyon's testimony relative to Hammer being advised of his rights and subsequent confession).
 
 
 34
 We hold that the evidence clearly establishes that Hammer was advised of his Miranda rights and that he thereafter confessed to Officer Runyon. The court did not err in admitting evidence of the confession.
 
 
 35
 We also reject Hammer's contention that the alleged error was compounded because he was proceeding pro se. Our review of the record reveals that Hammer performed very well proceeding pro se and that he was repeatedly and ably assisted by stand-by counsel. (R., Vol. I, Tab 45, pp. 50, 51, 63, 64, 65, 75, 76, 83, 150, 163, 166; Tab 46, pp. 179, 187, 188, 197, 218).
 
 III.
 
 36
 Hammer contends that the court erred in dismissing his petition and in rejecting his argument that he was denied his fundamental right to a fair trial by prosecutorial misconduct. Hammer argues that the state prosecutor's comments during closing arguments constituted misconduct:
 
 
 37
 Now try and envision how Mr. Upton felt. Not only has he gone through this horrifying experience, but he has after being kidnapped, spending three hours with this man who's threatening to kill him, strikes him twice with the gun, goes out, has the man shoot him three times in the head, and then to top this off, he has the same man who does this who commits these acts, show up at preliminary hearing, get in his face, argue with him time after time....
 
 
 38
 * * *
 
 
 39
 * * *
 
 
 40
 I submit that you can believe everybody who testified in this case for the State of Oklahoma even Mr. Hammer himself by way of Mr. Runyon, and that they all agree that these three crimes were committed and this is the man beyond any reasonable doubt whatsoever....
 
 
 41
 (R., Vol. I, Tab 46 at pp. 244 and 279).
 
 
 42
 Hammer objected to the first comment but did not object to the second. Hammer contends that the prosecutor's conduct was so egregious that it rendered his trial fundamentally unfair.
 
 
 43
 In Robison v. Maynard, 829 F.2d 1501, 1509 (10th Cir.1987), we held:
 
 
 44
 The standard upon which we are to judge the issue of prosecutorial misconduct is set forth in Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). In that case the Court held that prosecutorial misconduct in a state court violates a criminal defendant's federal constitutional rights only if the prosecutor's actions so infect the trial with unfairness as to make the resulting conviction a denial of due process.
 
 
 45
 Applying this standard to our case, we hold that the challenged remarks did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process." Id. The evidence against Hammer was overwhelming and there is no reasonable probability that the outcome of the trial would have been different if the remarks had not been made. We agree with the Court of Criminal Appeals of Oklahoma that the first comment was a reasonable inference to be drawn from the evidence in the record and that the second comment did not, based on a consideration of the entire closing argument, give rise to fundamental error. Hammer, 760 P.2d at 203-03.
 
 
 46
 AFFIRMED.
 
 
 
 *
 The Honorable Richard Owen, Senior United States District Judge for the Southern District of New York, sitting by designation
 
 
 **
 This Order and Judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3